UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

ROSE E.T. DEGROAT,

                                    Plaintiff,

        -against-                                    3:22-CV-507
                                                     (LEK/ML)
BENJAMIN BUCK, *et. al.*,

                                    Defendants.

_____

CADJI FERGUSON,

                                    Plaintiff,

        -against-                                    3:22-CV-516
                                                     (LEK/ML)
BENJAMIN BUCK, *et. al.*,

                                    Defendants.

_____

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I.      INTRODUCTION

On April 5, 2022, Plaintiffs Rose E.T. DeGroat and Cadji Ferguson filed a summons with

notice in New York State Supreme Court, Tompkins County, against Defendants Benjamin

Buck, Zachary Dorn, George DuPay and Gregory Herz (collectively, "Defendants"). Dkt. No. 1-

1. On May 16, 2022, Defendants removed this action from state court. Dkt. No. 1 ("Notice of

Removal"). Plaintiffs later filed their Complaint asserting claims arising under the Fourth

Amendment of the Constitution on July 12, 2022. Dkt. No. 5 ("Complaint").[1] The Complaint

raises claims of excessive force and failure to intervene. See id.

Presently before the Court is Defendants' motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6). Dkt. No. 14 ("DeGroat Motion"); No. 3:22-CV-516, Dkt. No. 13

("Ferguson Motion"). Plaintiffs have filed responses. Dkt. No. 31 ("DeGroat Response"); No.

3:22-CV-516, Dkt. No. 27 ("Ferguson Response"). Defendants have filed replies. Dkt. No. 32

("Reply to DeGroat Response"); No. 3:22-CV-516, Dkt. No. 28 ("Reply to Ferguson

Response"). For the reasons that follow, the motion to dismiss is denied in part and granted in

part.

## II.    BACKGROUND

### A. Factual Background

The following facts, which the Court assumes to be true at this stage, are taken from the

Complaint. See Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 76 (2d Cir. 2015).

### 1.  The Encounter Between Plaintiffs and Ming

On or around 1:10 AM on April 6, 2019, DeGroat left Casablanca Pizza—a pizza shop

located in the "Commons" in downtown Ithaca, New York—with her friends R.J., L.S., K.W.,

and D.S. Compl. ¶ 39. The Commons is a four-block pedestrian mall and shopping area in

downtown Ithaca, containing several shops, restaurants, and businesses. Id. ¶ 40. The group of

friends planned to meet Ferguson outside of Casablanca Pizza. Id. ¶ 41.

---

[1] On June 22, 2023, this Court sua sponte consolidated the two cases at Docket Numbers 3:22-CV-00507 and 3:22-CV-00516 pursuant to Federal Rule of Civil Procedure 42(a)(2). Dkt. No. 34. Plaintiffs filed separate actions but because of the similarities in claims and facts, the Court deemed DeGroat's case as the lead case, and Ferguson's case as the member case. See id.

As Ferguson approached the group of friends, he observed a stranger he would later learn was named Joseph Ming, "eyeing the group in a manner that Ferguson perceived to be" suspicious. Id. ¶ 42. Ferguson, however, did not take any actions toward Ming. Id.

Ferguson and the group began walking eastward down the Commons. Id. ¶ 43. As the group proceeded, Ming followed and remained "very close" to the group. Id. ¶ 44. Ming then walked directly behind L.S., "pressing his pelvis into L.S.'s backside. Ming's actions made the group, and especially L.S., very uncomfortable." Id. ¶ 45. L.S. did not consent to Ming pressing his pelvis into her backside. Id. ¶ 46.

Ferguson "asked his group of friends if anyone kn[ew] Ming, to which everyone in the group, feeling uncomfortable by Ming's presence, said no." Id. ¶ 47. Ferguson then asked Ming if he knew anyone in the group, and informed Ming "that his predatory actions were unwelcome and non-consensual." Id. ¶ 48. Ming, "disregarding Ferguson's question, said 'I'm just here . . . it's cool,' or something to a similar effect." Id. ¶ 49. Ferguson told Ming that he was not welcome and especially not welcome to "press his pelvis into L.S.'s backside." Id. ¶ 50.

After informing Ming he was not welcome with the group, "Ming swung his fist at Ferguson." Id. ¶ 51. Ferguson, "determining that Ming ha[d] turned violent after his perceived sexual advances toward L.S., pushed Ming back." Id. ¶ 52. During the skirmish, "DeGroat [stood] out of the way [and] protest[ed] the abhorrent and predatory nature of Ming." Id. ¶ 53.

Ming proceeded to "grab[] Ferguson by the jacket, as Ferguson attempted to take it off, then proceeded to swing Ferguson by his jacket." Id. ¶ 54. After a few seconds of struggling, Ferguson removed his jacket and punched Ming in the face. Id. ¶ 55. Ming fell to the ground. Id. He remained on the ground for a few seconds before getting back up. Id. ¶ 56.

    *2. Defendants' Encounter with Plaintiffs and the Group*

Shortly before Ming and Ferguson exchanged blows, Officers Buck, Dorn, DuPay, and Herz stood "at a location on the westward side of the commons, when a young woman approache[d] them." Id. ¶ 63. After "conversing with the young woman, [the officers] collectively [took] off running towards Ferguson." Id. ¶ 64.

As Herz ran towards Ferguson, "he grab[bed] hold of his taser and continue[d] to run holding it. Before he approache[d] Ferguson . . . Herz yell[ed] 'get on the ground' four times, pointing the taser directly at Ferguson." Id. ¶ 65. Herz "proceed[ed] to approach Ferguson from the back." Id. ¶ 66. "Meanwhile, DuPay approache[d] Ferguson and immediately grab[bed] onto his right arm with both of his hands twirling him a full 360 degrees, as Ferguson attempt[ed] to move away from Herz'[s] taser which [was] pointed directly at him." Id. ¶ 67. As DuPay "twirl[ed] Ferguson, Herz trip[ped] and [fell] to the ground." Id. ¶ 68. According to Plaintiffs, "[t]he body camera footage clearly shows Herz tripping over the legs of DuPay as he grabs Ferguson." Id. ¶ 69. After getting up, "Herz immediately deploy[ed] his taser right into Ferguson's back." Id. ¶ 70.

DeGroat then "st[ood] next to Ferguson, protesting Ferguson being assaulted and twirled by Officer DuPay and tased in the back by officer Herz." Id. ¶ 71. While Ferguson was "simultaneously" swung by DuPay and tased by Herz, "Ferguson [was] smashed to the ground, which he hit with the left side of his face." Id. ¶ 72. Meanwhile, DeGroat tried "assist[ing] Ferguson because of the illegal arrest and trie[d] to pull DuPay off of Ferguson believing that his arrest is unlawful, as Ferguson was only involved in the underlying altercation in self-defense against Ming's actions to L.S." Id. ¶ 73. Buck then "pull[ed] DeGroat away from DuPay and Ferguson and slam[med] DeGroat to the ground." Id. ¶ 74.

Buck then wrestled with DeGroat, "bending her background over a flowerbed in [an] attempt to pull her back to the ground." Id. ¶ 76. "DeGroat [was] then tackled back to the ground by Buck and Dorn. At this time, however, upon further information and belief, Dorn's body camera [fell] off and d[id] not record the next thirty-nine seconds of the altercation." Id. ¶ 78.

In the interim, "Herz continue[d] [to] stand[] over Ferguson pointing his taser at him." Id. ¶ 79. DuPay "then [held] Ferguson on the ground, twisting Ferguson's arm with his right hand." Id. ¶ 80. Subsequently, DuPay "turn[ed] Ferguson onto his stomach, as DeGroat [was] held on the ground by Buck and Dorn." Id. ¶ 81. After DuPay "point[ed] his taser at [a] group of bystanders," id. ¶ 82, he kneeled next to a "still and calm" Ferguson, id. ¶ 84. While DeGroat was "screaming and crying," Herz made his way to assist Buck and Dorn with DeGroat as DuPay placed Ferguson into handcuffs. Id. ¶¶ 85–86. For the next 36 seconds, Herz's body camera became covered, id. ¶¶ 88, 90, while "Buck presse[d] his left hand down on DeGroat's back" as she was placed on the ground. Id. ¶ 90. Herz's body camera became covered again for the next two minutes, id. ¶ 91, while "DuPay t[ook] a knee on Ferguson's back, despite Ferguson being in handcuffs." Id. ¶ 92.

According to Plaintiffs, "DuPay kneel[ed] on Ferguson's back for a period of time not less than one minute and eight seconds." Id. ¶ 93. Buck then "direct[ed] DeGroat up to a sitting position, and upon information and belief, hurt[] DeGroat." Id. ¶ 95. Lifting his left cheek from the ground, Ferguson urged DeGroat to calm down before placing his left cheek back on the ground. Id. DeGroat replied by stating, "okay" as she cried. Id. ¶ 96.

While on the ground, Ferguson told DuPay, "you guys don't even know what happened," id. ¶ 97 to which DuPay retorted, "I know, the only thing I saw was you take your jacket off and attack someone," id. ¶ 98. As Buck and Dorn brought DeGroat to her feet, id. ¶ 99, Ferguson told

the officers, "Okay, well you don't know what happened before that! [Ming] tried to assault my friend . . . he tried to assault my friend," id. ¶ 100.

After DuPay brought Ferguson to his feet, Defendants escorted both Plaintiffs to separate police cruisers with the help of other officers. Id. ¶¶ 101–02. Ferguson again informed DuPay that Ming tried to attack his friend, while DuPay proceeded "to remove the taser probes from Ferguson's back." Id. ¶¶ 103–04. Ferguson then stated: "I'm really very upset, because you guys tackled me and tased me, and I was not resisting or nothing." Id. ¶ 105. DuPay replied by stating, "well I was the first one to grab you . . . [and] you started pulling away from me." Id. ¶ 106. Ferguson stated that he moved back because Herz pointed a taser at him. Id.  Ferguson was then placed into the police cruiser. Id. ¶ 110.

### 3. The Aftermath of Plaintiffs' Arrest

DeGroat was arrested and arraigned the next morning at 9:00 AM on two counts of attempted assault and resisting arrest. Id. ¶ 111. Ferguson was arrested and issued an appearance ticket for disorderly conduct. Id. ¶ 112.

On April 17, 2019, "a Tompkins County Assistant District Attorney sent a letter to Ithaca City Court Judge Scott Miller stating that the District Attorney's office preferred not to prosecute [DeGroat's] case at the felony level, and requested an Order reducing Charges to Obstructing Governmental Administration in the Second Degree, which was later signed by [a judge]." Id. ¶ 120. However, approximately one month later, the "District Attorney's office reversed course and sent a Grand Jury Notice to DeGroat's Attorney after, upon information and belief, speaking to the Defendants about the incident." Id. ¶ 121. On June 6, 2019, DeGroat was indicted on one count of obstructing governmental administration, one count of attempted assault, and one count of resisting arrest. Id. ¶ 122. At the "end of August 2019, Ferguson had a bench trial over his

charge of disorderly conduct," where the "Honorable Scott Miller of Ithaca City Court acquitted Ferguson of all charges." Id. ¶ 123. On September 27, 2019, the Honorable John C. Rowley, Tompkins County Judge, issued an order "dismissing all of DeGroat's charges upon a motion for dismissal in the furtherance of justice." Id. ¶ 124.

### B.  Procedural History

On April 5, 2022, Plaintiffs filed a summons with notice in New York State Supreme Court, Tompkins County, against Defendants. Dkt. No. 1-1. On May 16, 2022, Defendants removed this action from state court. Dkt. No. 1. Attached to the Complaint, *inter alia*, are videos depicting the events relevant to this action. See Dkt. No. 9 ("Videos").

Defendants filed the present Motion on September 12, 2022. Dkt. No. 14. Plaintiffs filed their initial response on December 5, 2022. Dkt. No. 25. However, the Court deemed the memorandum of law insufficient because it did not (1) contain a table of contents as required under Local Rule 7.1(b)(1); (2) apply any legal analysis; and (3) discuss any conduct by Defendants. Dkt. No. 28 ("May 2023 Order").

The Court granted permitted Plaintiffs two weeks to file a response, which they failed to do. See Docket. Eventually, Plaintiffs' counsel explained that "a heavy trial preparation schedule" was responsible for the oversight, and requested additional time to file a response. Dkt. No. 29. The Court granted the request, Dkt. No. 30, and Plaintiffs eventually filed their timely opposition on June 9, 2023, Dkt. No. 31. Defendants filed their reply on June 16, 2023. Dkt. No. 32.

On June 22, 2023, the Court sua sponte concluded that the two related at actions at 3:22-CV-00507 and 3:22-CV-00516 should be consolidated pursuant to Federal Rule of Civil

Procedure 42(a)(2). Dkt. No. 34. It found that DeGroat's case should be the lead case, and Ferguson's case ought to be the member case. See id.

## III.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The Supreme Court has stated that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleading facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See Iqbal at 678–79.

## IV.    DISCUSSION

Defendants assert that Plaintiffs' excessive force and failure to intervene claims must be dismissed because (1) they fail to state a claim; or alternatively (2) that Defendants are entitled to qualified immunity. DeGroat Mot. at 6–19. Before addressing the parties' substantive arguments, the Court notes that Plaintiffs "respectfully request the Court to take judicial notice of the respective dispositions of the criminal cases filed against DeGroat and Ferguson by the Ithaca Police Department" pursuant to Federal Rule of Evidence 201. DeGroat Resp. at 7 (footnote omitted).

"[T]he [C]ourt may consider documents that are attached to the complaint, incorporated in it by reference, 'integral' to the complaint, *or the proper subject of judicial notice*." United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020) (emphasis added) (citations and quotations omitted). Under Federal Rule of Evidence 201, the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "A court may take judicial notice of a document filed in another court not for the truth of matters asserted in other litigation, but rather to establish the fact of such litigation and related filings." Glob. Network Commc'ns, Inc. v City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted). Indeed, "courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (citing United States v. Walters, 510 F.2d 887, 890 n. 4 (3d Cir. 1975)).

Here, the Court takes judicial notice of the dispositions of the criminal cases filed against each Plaintiff. See Kramer, 937 F.2d at 774. Specifically, the Court takes judicial notice of Judge Rowley's September 27, 2019, Order dismissing DeGroat's two misdemeanor charges "in

furtherance of justice," Compl. at 47–52, and Judge Miller's August 30, 2019, decision finding Ferguson not guilty of disorderly conduct after a bench trial. Ferguson v. Buck et. al., 22-CV-516, Dkt. No. 32 at 32–40. Consequently, the Court will consider the Complaint, the Videos, and the dispositions of the state criminal actions against Plaintiffs. The Court now turns to the parties' arguments.

### A. Plaintiffs' Excessive Force Claims

For excessive force claims in the Fourth Amendment context, law enforcement officers may use only such force as is objectively reasonable under the circumstances. See Graham v. Connor, 490 U.S. 386, 396–97 (1989) (citation omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. at 396. Likewise, excessive force claims "require[] consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) (citations omitted). Therefore, "[d]etermining excessiveness requires 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (quoting Graham, 490 U.S. at 396).

#### 1. DeGroat's Excessive Force Claims Against Buck, Dorn, and Herz

##### a. DeGroat's Excessive Force Claim Against Buck and Dorn

Because DeGroat's allegations of excessive force against Buck and Dorn appear coextensive, the Court will analyze her claims against each Defendant together. See, e.g., Compl. ¶ 78 (DeGroat was "tackled back to the ground by Buck and Dorn"); id. ¶ 81 ("DeGroat [was]

10

held on the ground by Buck and Dorn"); id. ¶ 88 ("Buck and Dorn continue[d] to wrestle with DeGroat and, upon information and belief, place[d] her into handcuffs during this time").

Buck and Dorn argue that DeGroat's claim against them should be dismissed because their use of force was objectively reasonable under the circumstances. See DeGroat Mot. at 9–10. Buck emphasizes that he and his co-defendants "were responding to a violent altercation on the commons." Id. Moreover, Buck states that "DeGroat posed an immediate threat to Officer DuPay's safety when she was pulling him from behind and when she was striking him." Id. at 9. Thus, "Buck's alleged use of force . . . including pulling DeGroat away from Officer DuPay, taking her to the ground, bending her over a flowerbed to get her to the ground, tackling her to the ground, and holding her on the ground for a brief time until handcuffing her" was objectively reasonable "because DeGroat interfered with Ferguson's arrest by using force against the police and then she resisted her own arrest." Id. Likewise, Dorn asserts: "When Officer Buck responded by pulling DeGroat away from Officer DuPay and taking her to the ground, she resisted. It was objectively reasonable for [Dorn] to assist with getting DeGroat on the ground and keeping her there until she stopped resisting." Id. at 9.

DeGroat sees things differently. DeGroat explains: "Buck used excessive force against [her] when, after he pulled DeGroat off DuPay, he slammed her to the ground, continued to wrestle with her, and bent her over a flowerbed trying to get her to the ground" and that "Buck continued to use excessive force when he, with Dorn . . . wrestled with DeGroat and held DeGroat to the ground when they placed handcuffs on her." DeGroat Resp. at 8. DeGroat reasons that "[o]nce Buck had removed [her] from DuPay he could have employed other techniques in effecting [the] arrest, other than throwing her to the ground, bending her over a planter." Id. at 9. She elaborates:

> Although the officers were responding to an altercation on the Commons, DeGroat was not involved in the altercation. DeGroat was intervening on behalf of Ferguson who was being attacked by an officer just after having been attacked by Ming. It would have been reasonable and sufficient for Buck to have pulled DeGroat off DuPay, but at that point it was not objectively reasonable for him to have slammed her to the ground, or bent DeGroat over a flowerbed in an effort to bring DeGroat to the ground.

Id. DeGroat also adds that it was objectively unreasonable for Dorn to have assisted Buck in carrying out his alleged excessive use of force. See id.

The Court agrees with DeGroat. As discussed above: "A claim that excessive force was used in the course of a seizure is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." Sullivan, 225 F.3d at 165 (citation omitted).

The first factor—the severity of the crimes at issue—favors DeGroat. The first crime, resisting arrest, is merely a Class A Misdemeanor. Compl. ¶ 111. Misdemeanors are considered non-serious crimes for purposes of the Graham analysis. Ketcham v. City of Mount Vernon, 992 F.3d 144, 150 (2d Cir. 2021) (finding that the first Graham factor favored the plaintiff because "the offense was a misdemeanor"); see also Gersbacher v. City of New York, 134 F. Supp. 3d 711, 723 (S.D.N.Y. 2015) ("Obstruction of Governmental Administration . . . and Resisting Arrest[ ] are not severe."). The severity of the second crime—attempted assault—is a closer question. Attempted assault in the second degree is a Class E felony under New York law, see Mot. at 6. However, the Court is unaware of a reported Second Circuit decision categorically classifying attempted assault as a serious crime for the purposes of the Graham analysis. Therefore, in "consideration of the specific facts" of this action, Sullivan, 225 F.3d at 165, the Court concludes that the severity of DeGroat's alleged crime was minor. In particular, DeGroat

12

was unarmed, and no facts were present that suggested to the officers that she had a weapon. Furthermore, as DeGroat notes, Buck (and Dorn) "appear[] to be much larger" than her, and the officers were accompanied by other armed officers who were also larger than DeGroat. DeGroat Resp. at 9. It is also relevant that DeGroat was charged with *attempted* assault (notably, a charge that was ultimately dismissed) rather than assault. Cf. McCrory v. Belden, 01-CV-525, 2003 WL 22271192, at *5 (S.D.N.Y. Sept. 30, 2003) ("Moreover, in contrast to the plaintiff in [another case], who pled guilty *to assault*, [the plaintiff here] pled guilty only to attempted assault. This fact suggests an even greater likelihood that any substantial force applied by [the officers] after [P]laintiff's *alleged assault* against them had ended would have been unjustified." (emphasis added)).

The second factor—whether DeGroat posed an immediate threat to the safety of the officers or others—tips in favor of DeGroat at this stage in the litigation. After Ferguson was tased and brought to the ground by DuPay, DeGroat "attempt[ed] to assist Ferguson . . . and trie[d] to pull DuPay off of Ferguson." Compl. ¶¶ 72–73. The video footage capturing this portion of the encounter supports this conclusion. The Videos show a clearly unarmed DeGroat approaching DuPay from behind as she tried swiping at DuPay's back while DuPay mounted a tased Ferguson. But in her attempt to "assist Ferguson," id. ¶ 73, DeGroat was swiftly surrounded and subdued by several larger armed officers who immediately "slam[med her] to the ground." See id. Moreover, DeGroat's swipe attempt did not appear to injure DuPay. See id. Therefore, classifying a clearly unarmed DeGroat—who swiped at DuPay's back while she was surrounded and instantly subdued by several larger police officers—as "an immediate threat" would strain the meaning of the phrase. Cf. Garcia v. Dutchess Cnty., 43 F. Supp. 3d 281, 292 (S.D.N.Y. 2014), (finding that a reasonable jury could find that the plaintiff did not pose an

immediate threat while she was unarmed even though she kicked an officer and was "combative"), aff'd in part, dismissed in part due to lack of appellate jurisdiction, Garcia v. Sistarenik, 603 F. App'x 61 (2d Cir. 2015). Therefore, in "consideration of the specific facts in [this] case," Sullivan, 225 F.3d at 165, and drawing all inferences of favor of DeGroat, Allaire Corp., 433 F.3d at 250–51, the Court finds that this factor weighs in DeGroat's favor.

The third factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—weighs against DeGroat. "[R]esisting arrest can include passive resistance or non-compliance." Harris v. Leon, No. 20-CV-10864, 2023 WL 2051171, at *3 (S.D.N.Y. Feb. 16, 2023) (citing Brown, 798 F.3d at 103). DeGroat plainly concedes that she "resist[ed] the [] arrest." Compl. ¶ 85. The Court has reviewed the record and agrees.

As discussed, weighing the Graham factors "requires careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396. Undoubtedly Buck and Dorn had a reasonable need to ensure public safety late at night on the Commons. But when drawing all inferences in favor of DeGroat, she states a plausible claim for excessive force in violation of the Fourth Amendment. Despite DeGroat's resistance, she was unarmed and considerably smaller than Buck and Dorn. When she attempted to swipe at DuPay's back, she was surrounded, and easily subdued by the officers. She thus posed a minimal threat to Defendants. Despite these facts, Buck "slamm[ed] DeGroat to the ground, ben[t] her over a flowerbed, and . . . wrestle[d] with her on the ground in order to place handcuffs on her." DeGroat Resp. at 15. Likewise, Dorn "assisted Officer Buck in tackling her to the ground and eventually handcuffing her." DeGroat Mot. at 10 (citing Compl. ¶¶ 78, 81). As alleged in the Complaint and reflected in the Videos, this level of force from Buck and Dorn was objectively unreasonable. See Sullivan, 225 F.3d at 165–66 ("The fact that a person whom a police officer attempts to arrest resists, threatens, or

14

assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit.") (emphasis in original); See Brown, 798 F.3d at 102 ("[Notwithstanding plaintiff's resistance,] [a]n aggregate assessment of all three relevant Graham factors would seem to point toward a determination of excessive force . . . ."). Accordingly, because DeGroat states a plausible claim under the Fourth Amendment's prohibition on excessive force, the motion to dismiss is denied with respect to DeGroat's excessive force claims against Buck and Dorn.

### b. DeGroat's Excessive Force Claim Against Herz

DeGroat also raises an excessive force claim against Herz. Compl. at 24. However, this claim fails. The only claim for excessive force against Herz is that he "deploy[ed] his taser into DeGroat's left side in her rib-cage area." Compl. ¶ 77. However, the Videos contradict this account. As Defendants correctly note, the Videos show that Herz tased Ferguson rather than DeGroat. See DeGroat Mot. at 11. During the period that DeGroat alleges she was tased by Herz, the Videos show Herz standing over Ferguson with the taser clearly not in use. Thus, given that the record clearly contradicts DeGroat's Complaint, her claim against Herz for excessive force is dismissed. Cf. Scott v. Harris, 550 U.S. 372, 380–81 (2007) (holding that summary judgment should have been granted to defendant on an excessive force claim based on video evidence).

### 2. *Ferguson's Excessive Force Claim Against Herz, Buck, and Dorn*

### a. Ferguson's Excessive Force Claim Against Herz

Ferguson contends that Herz "used excessive force against [him] when he unnecessarily and unreasonably tasered him." Ferguson Resp. at 10. Ferguson elaborates:

> Ferguson was standing apart from Ming. He was not actively arresting arrest or evading arrest by fleeing. In fact, he had little time to understand what was happening to him when the officers charged him. The officers had no understanding of the underlying incident

at the time they seized Ferguson. He was unarmed and not fighting with the officers, and his reaction to move away from the taser being pointed at him was instinctual. D[u]Pay forcefully grabbed Ferguson and Herz tased him. Under the circumstances, the use of force here was objectively unreasonable as the officers could have simply separated Ming and Ferguson and made inquiries as to their conflict. Instead, they exacerbated the situation by rushing Ferguson who had little or no time to react or understand what was happening to him, especially when he was being attacked by officers to whom he posed absolutely no threat.

Id. at 11–12.

Conversely, Herz maintains that "use of his [t]aser to control Ferguson and effectuate his arrest was objectively reasonable." Ferguson Mot. at 9. Herz argues:

[T]he Officers saw Ferguson punch a man in the face and knock him to the ground, they ran over and Officer Herz yelled four times for Ferguson to "get on the ground" while he was pointing his Taser at Ferguson. Ferguson admits that not only did he not get on the ground but he was also attempting to pull away from Officer DuPay's grasp because of the fact that Officer Herz was pointing a Taser at him. Ferguson admits that he was interfering with his own arrest. Officer Herz then tased him and Ferguson "smashed" to the ground. Then according to Ferguson's allegations, Officer DuPay took over from there by putting Ferguson on his stomach, handcuffing him, removing the Taser probes, and putting him in a police vehicle.

Id.

The Court agrees with Ferguson. The three Graham factors coupled with the "careful attention to the facts and circumstances of each [this] case" plainly show that Ferguson states a plausible claim of excessive force under the Fourth Amendment.

The first factor—the severity of the crime at issue—indisputably favors Ferguson. Ferguson was arrested for disorderly conduct, which is merely a violation under New York law. This is not a serious crime for purposes of the Graham analysis. See Brown, 798 F.3d at 102 ("[T]he severity of the crime is unquestionably slight. The disorderly conduct offense is subject to a maximum penalty of fifteen in jail.").

The second factor—whether Ferguson posed an immediate threat to the safety of officers or others—weighs in favor of Ferguson at this stage in the litigation. Herz argues that the officers "saw Ferguson punch a man in the face and knock him to the ground" and thus found it necessary to "point[] his Taser at Ferguson" and ultimately tase him for "pull[ing] away." Ferguson Mot. at 9. However, this statement omits key information apparent to Herz during the incident. See Graham, 490 U.S. at 396. ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene."). While the Videos indicate that the officers were aware that Ferguson punched Ming, Ming returned to his feet in seconds and by the time the officers arrived on the scene, it was clear that Ferguson and Ming were squaring up with one another "like boxers." Compl. at 43. Indeed, the Videos suggest that from Defendants' perspective, Ming and Ferguson both appeared to contribute equally to the melee, but only Ferguson was singled out by Defendants. Importantly, neither individual appeared seriously harmed by the time Defendants arrived. And both individuals were clearly unarmed. Defendants do not suggest that they were concerned that Ferguson was armed. Nor do they intimate that Ferguson threatened them. "The video corroborates that . . . [the plaintiff] did not use force . . . and did not physically threaten the [] Defendants." Harris, 2023 WL 2051171, at *3. Critically, at the "time the officer deployed force [of the taser]," id., DuPay had already restrained Ferguson. Ferguson was thus detained shortly before he was tased. Finding that Ferguson posed a threat to Defendants or the public proves difficult in light of this fact. Accordingly, this factor weighs in Ferguson's favor.

The third factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—clearly weighs in favor of Ferguson. The only resistance the Court can glean from the Videos and Complaint is Ferguson taking a step back when Herz brandished a taser.

Defendants' argument that this movement qualifies as "evad[ing] custody," Ferguson Mot. at 11, stretches credulity. This argument also contradicts the Second Circuit's reasoning in <u>Brown</u>, where the Second Circuit reversed a district court's grant of summary judgment to an officer accused of excessive force. There, the plaintiff was arrested for disorderly conduct (like Ferguson) and also resisted arrest by refusing to submit to handcuffing. <u>Brown</u>, 798 F.3d at 102. Here, the facts are even more favorable to Ferguson because after he was tased, he was swiftly restrained, and had no way to resist arrest. But, like <u>Brown</u>, Defendants do not allege that Ferguson attacked an officer. Nor do they claim that Ferguson tried to run away. <u>Id.</u> ("As for actively resisting arrest, [the plaintiff] was not fleeing, nor physically attacking an officer, nor even making a move than officer could reasonably interest as threatening an attack." (internal citations omitted)). Consequently, the third factor tips in Ferguson's favor.

Furthermore, as a sister court in this Circuit has observed concerning use of a taser in the excessive force context: "The enumerated <u>Graham</u> factors are not exhaustive. Another factor . . . that courts often cite is whether the plaintiff was warned that a taser would be used if he or she did not comply with the officer's directive." <u>Harris</u>, 2023 WL 2051171, at *3 (collecting cases). Here, Defendants do not argue that Herz warned Ferguson he would be tased. <u>See generally</u> Ferguson Mot. The Videos likewise support the conclusion that no warnings were issued. And although the Videos suggest that Herz yelled "get down on the ground," they also demonstrate that complying with this command proved impossible because there was not enough time for Ferguson to comply. Defendants grabbed Ferguson as Herz commanded him to lay prone, and within seconds, Herz tased him. Thus, because Ferguson was not warned that he would be tased if he did not comply with Herz's directive, this further suggests that Ferguson states a plausible claim of excessive force.

Herz nevertheless argues that "his use of his Taser to control Ferguson and effectuate his arrest was objectively reasonable. In cases involving Tasers, the Second Circuit has held that the use of a Taser against a suspect actively resisting arrest is not unreasonable." Ferguson Mot. at 9 (citations omitted). Herz cites the Second Circuit's decisions in Crowell v. Kirkpatrick, 400 F. App'x 592, 595 (2d Cir. 2010) and Macleod v. Town of Brattleboro, 548 F. App'x 6, 8 (2d Cir. 2013) to support his argument.

As an initial matter, Herz appears to argue that use of a taser against resisting suspects is always objectively reasonable. However, the Supreme Court's decision in Graham forecloses any such categorical rule. Graham, 490 U.S. at 396 (holding that excessive force claims "require[] careful attention to the facts and circumstances of each particular case."). The Second Circuit has also repeatedly emphasized that courts must consider the specific facts and circumstances of each case on its own. See Sullivan, 225 F.3d at 165; See Brown, 798 F.3d at 100. Likewise, Herz's specific argument has been rejected by other district courts in this Circuit. See, e.g., Harris, 2023 WL 2051171, at *4 ("Defendants imply that it is not excessive force as a matter of law—i.e., that it is always objectively reasonable—to use a taser after a warning against a resisting arrestee in order to accomplish the arrest, regardless of whether the arrestee is a threat or was dangerous. The case law does not support that proposition.").

Moreover, the two cases cited by Herz in support of his proposed bright-line rule are inapposite. MacLeod involved a motorist who was tased by officers after speeding away during a traffic stop. He eventually led the officers on "a chase. . . [on] dark roads . . . to evade arrest." MacLeod, F. App'x, at *8. The suspect also "contravene[d] clear, repeated instructions that he acknowledges he understood." Id. The Second Circuit held that use of a taser in these circumstances was objectively reasonable because of the plaintiff's erratic behavior and because

he contravened repeated instructions. Here, however, Ferguson punched Ming, but Ming stood

up within seconds and squared up with Ferguson "like boxers." Compl. at 23. This use of force

by Ferguson in alleged self-defense after being pushed and grabbed, see id. at 8, cannot

reasonably be said to pose as significant of a risk to others as speeding in the dark and leading

officers on a high-speed chase. And unlike the motorist in MacLeod, the Complaint alleges (and

Videos demonstrate) that Ferguson did not evade arrest. Likewise, Ferguson did not

"contravene[] clear, repeated instructions that he acknowledges he understood." Id. Instead, an

unarmed Ferguson was grabbed and tased without being given an opportunity to comply with

Herz's command. Consequently, the "facts and circumstances" as alleged in the Complaint and

highlighted in the Videos are worlds apart from those in MacLeod. Graham, 490 U.S. at 396.

Herz's reliance on Crowell is equally unpersuasive. In Crowell, the plaintiffs were

arrested for trespass and resisting arrest after chaining themselves to a barrel drum. Crowell, F.

App'x at 2. The plaintiffs refused to release themselves despite several attempts by the defendant

officers. The plaintiffs there admitted that the officers "considered and attempted several

alternate means of removing them from the property before resorting to use of the tasers that the

officers expressly warned them that they would be tased and that it would be painful, and that the

officers gave them another opportunity to release themselves from the barrel after this warning."

Id. Here, however, as alleged in the Complaint and shown on the Videos, Herz never warned

Ferguson he would employ use of a taser. Neither did Herz nor any other Defendant attempt

"alternate means of" defusing the situation. Id. Indeed, while the defendants in Crowell warned

the plaintiffs several times concerning usage of a taser, no such warnings occurred here.

Therefore, reliance on MacLeod and Crowell are "inapt because the factual circumstances are

substantially different" from the present case. <u>Williams v. Olsen</u>, No. 18-CV-1446, 2022 WL 16572043, at *10 (N.D.N.Y. Nov. 1, 2022) (Kahn, J.).

In sum, Ferguson states a plausible claim of excessive force against Herz. Accordingly, Defendants' motion to dismiss Ferguson's excessive force claim against Herz is denied.

b. <u>Ferguson's Excessive Force Claim Against Buck and Dorn</u>

Ferguson's Complaint also raises excessive force claims against Dorn and Buck. Ferguson Mot. at 22. Defendants maintain that these claims fail because "Ferguson does not allege any facts about Officer Buck [and Dorn] using any force on him." <u>Id.</u> at 8. The Court agrees. Ferguson states in a conclusory manner that Buck and Dorn's "use of force, as described in the Complaint, were objectively unreasonable." <u>See id.</u> However, there is a glaring absence of any allegations of excessive force in the Complaint concerning these Defendants' actions toward Ferguson. <u>See generally id.</u> Ferguson's Response does not address this portion of the Motion either. Accordingly, because Ferguson has not alleged a plausible claim of excessive force against Buck and Dorn, those claims are dismissed.

**B. Plaintiffs' Failure to Intervene Claims**

Defendants also urge the Court to dismiss Plaintiffs' failure to intervene claims against DuPay. DeGroat Mot. at 13.

"It is widely recognized that all law enforcement officials have an affirmative duty to protect the constitutional rights of citizens from infringement by other law enforcement officials in their presence." <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been

committed by a law enforcement official." Id. (citations omitted). Additionally, "[a]n officer who does not personally inflict the injury at the core of an excessive use of force claim may still be liable under § 1983 where the officer fails to intervene to prevent the harm, in spite of a 'realistic opportunity' to do so, and 'observes or has reason to know . . . that excessive force is being used.'" Allen v. City of New York, 480 F. Supp. 2d 689, 694 (S.D.N.Y 2007) (internal citations omitted).

At this stage in the litigation, DeGroat states a plausible claim for failure to intervene. The Videos and Complaint indicate that after DeGroat was slammed by the other officers, Compl. ¶ 74, DuPay "was alerted to the need to protect [DeGroat] from further abuse." O'Neill v. Krezminski, 839 F.2d 9, 12 (2d Cir. 1988). DuPay retorts that DeGroat's claim fails because he "did not have sufficient time to prevent the alleged force." DeGroat Mot. at 15. The Court agrees with DuPay to the extent that Buck's initial slam of DeGroat, Compl. ¶ 74, was insufficient to provide a realistic opportunity for DuPay to intervene. However, the "subsequent" use of force by Buck of "bending her background over a flowerbed . . . [and] wrestl[ing] with DeGroat," id. ¶¶ 76, 88, along with the subsequent "tackle[] back to the ground by Buck and Dorn" id. ¶ 78, lasted nearly a full "minute." DeGroat Mot. at 6; see O'Neill, 839 F.2d at 12 ("The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator. With respect to the subsequent dragging of O'Neill across the floor, however, the case against Conners is adequate to create an issue of fact for the jury. Having seen the victim beaten, he was alerted to the need to protect O'Neill from further abuse."). As a result, the Videos and Complaint indicate that after Buck slammed DeGroat to the ground, DuPay was put on sufficient notice that

he should have intervened. Once DuPay did not try stopping Buck and Dorn after the initial

slam, there arose a "sufficient duration to support a conclusion that [when Dupay] stood by

without trying to assist [DeGroat, he] became a tacit collaborator." O'Neill, 839 F.2d at 12.

Consequently, DeGroat states a plausible claim of failure to intervene against DuPay for not

interceding to halt the "bending" of DeGroat backward over a flowerbed, and subsequent

tackling and wrestling from Buck and Dorn. Compl. ¶¶ 76, 78.

The Court reaches a different conclusion with respect to Ferguson's failure to intervene

claim. Ferguson alleges that DuPay failed to intervene after Herz tased him. However, the Court

agrees with DuPay that it was unrealistic to expect DuPay to "to prevent the tasing."  Ferguson

Mot. at 13. Based on the Videos and Complaint, DuPay grabbed Ferguson and was not facing

Herz when Herz fired his taser. The duration from when DuPay grabbed Ferguson and turned

around to see Herz brandishing a taser amounted to no more than two or three seconds. "This

was not an episode of sufficient duration to support a conclusion that an officer who stood by

without trying to assist the victim became a tacit collaborator." O'Neill, 839 F.2d at 12.

Accordingly, Ferguson's failure to intervene claim against DuPay is dismissed.

### C.  Qualified Immunity Defense

Defendants argue that even if they violated Plaintiffs' constitutional rights, they are

entitled to qualified immunity. DeGroat Mot. at 15.

"Although a defendant may assert the defense of qualified immunity in a motion to

dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the

pleading stage." Collins v. Ferguson, 804 F. Supp. 2d 134, 140–41 (W.D.N.Y. 2011) (collecting

cases). "Because the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t

is generally premature to address the defense of qualified immunity in a motion to dismiss

pursuant to [Rule] 12(b)(6).'" <u>Bernstein v. City of New York</u>, No. 06-CV-895, 2007 WL 1573910, at * 9 (May 24, 2007) (alterations in original) (citations omitted). Therefore, courts in this Circuit routinely decline to address the defense of qualified immunity at the pleading stage. <u>See</u> <u>Collins</u>, 804 F. Supp. 2d at 140; <u>Bernstein</u>, 2007 WL 1573910, at *9; <u>Middleton v. City of New York</u>, No. 04-CV-1304, 2006 WL 1720400, at *12 (E.D.N.Y. June 19, 2006); <u>Levine v. Lawrence</u>, No. 03-CV-1694, 2005 WL 1412143, at *10 (E.D.N.Y. June 15, 2005). The Court will follow the lead of other courts in this Circuit. <u>See</u> <u>id.</u> Accordingly, dismissal on the basis of qualified is premature at this stage.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion to dismiss (Dkt. No. 14) is **DENIED in part** with respect to: (1) DeGroat's excessive force claim against Buck and Dorn; (2) DeGroat's failure to intervene claim against DuPay; (3) Ferguson's excessive force claim against Herz (No. 3:22-CV-516, Dkt. No. 13); and (4) dismissal on the basis of qualified immunity; and it is further

**ORDERED**, that that Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED in part** to the extent it sought dismissal of: (1) DeGroat's excessive force claim against Herz; (2) Ferguson's excessive force claim against Dorn and Buck (No. 3:22-CV-516, Dkt. No. 13); and (3) Ferguson's failure to intervene claim against DuPay (No. 3:22-CV-516, Dkt. No. 13); and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        July 26, 2023
              Albany, New York

                              LAWRENCE E. KAHN
                              United States District Judge